UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

        v.

VITALII ANTONENKO,
  a/k/a "Sabe,"
  a/k/a "Sabeseller,"

                      Defendant

20-CR-10102 (WGY)

## MOTION UNDER SELL v. UNITED STATES

In *Sell v. United States,* 539 U.S. 166, 179-80 (2003), the Supreme Court determined that the Fifth Amendment's Due Process Clause permits the government to administer antipsychotic drugs involuntarily to a mentally ill defendant facing serious criminal charges to render that defendant competent to stand trial, if certain conditions are met. To establish the "rare" case in which forcible medication is appropriate to restore competency, the government must show by clear and convincing evidence that: (1) "important" governmental interests are at stake; (2) involuntary medication will "significantly further" the governmental interests; (3) involuntary medication is "necessary" to further those interests; and (4) the administration of drugs is "medically appropriate." *United States v. Vigeant*, 2012 WL 3064410, *3 (D. Mass. Apr. 18, 2012) (Sorokin, M.J.) (citing *Sell*, 539 U.S. at 179-80); *see also United States v. Filho*, 245 F. Supp.3d 309, 311 n.1 (D. Mass. 2017) (Gordon, J.) (citing *Sell* factors).

In defendant Vitalii Antonenko, the United States respectfully submits that the Court appears to have before it one of the "rare" cases that satisfy *Sell*'s requirements. Important governmental interests are at stake where the defendant is charged with serious crimes against

property—a computer hacking conspiracy that enabled the theft and sale of wholesale quantities of credit and debit card data over the internet. It also appears—based on a Bureau of Prisons ("BOP") Forensic Evaluation that followed this Court's order that the defendant undergo competency restoration and evaluation under 18 U.S.C. § 4241(d)—that the defendant's mental condition, namely schizophrenia, continues to render him not competent to proceed to trial. The BOP has preliminarily assessed a "substantial probability … that [the defendant's] competency to stand trial can be restored with appropriate treatment … and that less intrusive methods of treatment, such as psychotherapy, are not likely to restore his competence." Under these circumstances, the Court should determine that important governmental interests are at stake (the first *Sell* factor), and it should order the Federal Medical Center at Butner, North Carolina to submit an Addendum to its Forensic Evaluation that would outline in detail the BOP's proposed treatment plan and further details pertinent to the remaining *Sell* factors. Counsel for the defendant has indicated his assent to the government's filing of this motion.

I.   Background

Federal agents arrested the defendant in New York City on March 2, 2019 on a complaint charging money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). After an evidentiary hearing, the Court (Hennessy, M.J.) found that the defendant was a flight risk and that he posed an economic danger to the community and ordered him detained pending trial. (Mem. and Order on Detention, Docket No. 28). On May 26, 2020, a federal grand jury in Boston indicted the defendant, charging him in two counts with conspiracies to obtain unauthorized access to computers and to traffic in access devices (*i.e.*, payment card account numbers), in violation of 18 U.S.C. § 371 (Count 1), and to launder the proceeds of those offenses, in violation of 18 U.S.C. § 1956(h) (Count 2). (Docket No. 57).

Between in or about December 2013 and in or about November 2016, as alleged in the Indictment, the defendant agreed with others to use hacking techniques and tools, among them SQL Injection Attacks and Shells described in the Indictment, to gain unauthorized access to computer networks. He used that access to steal from those networks (1) names; (2) Social Security numbers; (3) dates of birth (together "Personally Identifiable Information" or "PII"); (4) credit and debit card account numbers; (5) expiration dates; and (6) card verification values (together "Payment Card Data"). (Indictment ¶¶ 4, 10a). The defendant identified and exfiltrated millions of pieces of PII and Payment Card Data. He then consigned for sale hundreds of thousands of them on Carding Forum A, which has since 2012 offered for sale the PII and Payment Card Data of hundreds of millions of consumers through the United States and around the world. (*Id.* ¶ 4). The defendant then worked with other co-conspirators to launder the proceeds of his Carding Forum A sales using peer-to-peer cryptocurrency exchanges, cash transactions, and U.S. bank accounts. (*Id.* ¶¶ 15-16).

If convicted of the charges in the Indictment, the defendant faces a statutory maximum term of 5 years in custody on Count 1 and 20 years in custody on Count 2. The government estimates the defendant's Guidelines Sentencing Range after a conviction at trial to be at or near the cumulative statutory maximums on these two counts—235 to 293 months—based on both losses sustained by the corporate victims of the network intrusions (under 18 U.S.C. § 1030(e)(11)) and the hundreds of thousands of stolen access devices that the defendant trafficked over Carding Forum A. *See* U.S.S.G. § 2B1.1, Application Note 3(F)(i) ("In a case involving any … unauthorized access device, loss … shall be not less than $500 per access device.")

II.     Procedural History Relevant to Competency and Restoration

The Court has ordered, pursuant to 18 U.S.C. § 4241(a), three competency evaluations for the defendant. These were performed by (1) Dr. Shawn Channell, a BOP forensic psychologist at FCI Devens in or about November 2019 (Docket No. 31); (2) Dr. Julia Reade, a board-certified psychiatrist retained by the United States in or about January 2020 (Docket No. 44); and (3) Dr. Heather Ross, a BOP forensic psychologist at FCI Butner in or about May 2020 (Docket No. 52).

As reported by each of his evaluators, the defendant hampered these evaluations by refusing to participate in them. The clinicians were left to rely on information that the defendant and his mother provided during Pretrial Services interviews in connection with his arrest; observations that the defendant's counsel and mother have made regarding the defendant; and records of defendant's *de minimis* interactions with jail personnel.

Of significant and consistent concern to the evaluators (and to the parties) is the fact that the defendant has cut himself off from contact with his counsel and his mother for more than three years. (*E.g.*, Channell Report at 4). Before doing so, the defendant suggested to both of them that he was an employee of the CIA, which would intervene to address his criminal charges. (Reade Report at 1, 9). And while the defendant had largely shut himself off from most interaction while in detention, the three competency evaluations reflect that he had continued to eat; to engage in self-care; to request appropriate medical and dental care; and to follow institutional rules (such as writing only on permitted surfaces in his cell); and to demonstrate insight into difficult concepts, such as explaining why he was likely to test positive for tuberculosis or indicating his understanding on the limits of confidentiality during his evaluations. (Reade Report at 5, 8). The defendant similarly made a decision to answer questions at FMC Devens about his risk of self-

harm, understanding that the consequences of not answering would put him in a more restrictive setting (*i.e.*, suicide watch). (Channell Report at 4-5). The defendant's years-old reference to working for the CIA notwithstanding, neither of the evaluators who had met with him concluded that the defendant was responding to internal stimuli (*i.e.*, hallucinations or delusions) when they were speaking with him. (Ross Report at 5; Channell Report at 5).

Dr. Channell concluded that the defendant was "most likely experiencing the symptoms of a psychotic disorder," although he could not specify which one based on the defendant's refusal to engage with him, and could not rule out the possibility that the defendant was engaging in deliberate behavior. (Channell Report at 7). Dr. Channell also concluded, based on conversations with the defendant's counsel, that Antonenko is "unable to assist in his defense." *Id.*

Dr. Reade declined to offer a psychiatric diagnosis or an opinion on the defendant's ability to assist with his defense based on his refusal to participate in the evaluation. (Reade Report at 9). Dr. Reade disagreed with Dr. Channell's diagnosis of a psychotic disorder, noting that positive symptoms of psychosis, including "hallucinations, delusions, and/or disorganized thinking or behavior," must be present to make the diagnosis of a psychotic disorder. (Reade Report at 10).

Dr. Ross offered only an "unspecified" and "provisional" diagnosis of a psychotic disorder, citing the defendant's failure to participate meaningfully in the evaluation. (Ross Report at 6). "[O]ut of an abundance of caution," Dr. Ross recommended that the defendant be found incompetent to stand trial because she could not make "a clear assessment that he is competent."

On September 8, 2020, after an evidentiary hearing, Magistrate Judge David H. Hennessy issued a Report and Recommendation on Competency to Stand Trial ("CST R&R"). (Docket No. 79). In the CST R&R, Judge Hennessy found that the defendant was suffering from a mental disease or defect. (CST R&R at 23-24). But Judge Hennessy also found that, although the question

5

was a close one, the defendant had not met his burden of showing by a preponderance of the evidence that the mental disease or defect rendered him mentally incompetent to understand the nature and consequences of the proceedings against him or to assist properly in his defense. (*Id.* at 30). This Court adopted the CST R&R on September 29, 2020, approving both its "reasoning and result." (Docket No. 80).

Following the Court's September 2020 competency determination, however, the defendant's mental health appeared to have deteriorated. He continuously failed to engage in any contact with either his mother or his counsel—symptoms of mental disease or defect that caused Judge Hennessy and the parties significant concern. In October 2020, Judge Hennessy ordered the defendant's custodians at the Wyatt Detention Facility ("WDF") to put him on a Zoom conference with his mother, who reported that he did not speak to or look at her, much as he had not spoken to or looked at anyone at his competency hearing. (Throughout the hearing, as Judge Hennessey noted in the CST R&R, the defendant's head was continuously affixed in an upward position, and he maintained a blank look in his eyes).

Thereafter, at WDF, the defendant stopped caring for his finger and toe nails. At the request of his custodians, who feared for his and others' safety, the government moved (with defense counsel's assent) for an order permitting the use of reasonably necessary force to bathe, manicure, and reclothe him. (Docket No. 101). The Court issued the requested order. (Docket No. 102-103). The defendant also again refused to meet with a psychiatrist, this one retained by his counsel. (Docket No. 105, Attachment 4).

The parties agreed that the passage of significant time—nearly a full year since the Court's competency determination, with either (at best) no change or (at worst) a deterioration in the defendant's behaviors and mental status—had decreased the likelihood that he was malingering,

6

with a corresponding increase in the likelihood that his mental health would continue to deteriorate if left untreated. In light of those developments and the due process risks inherent in trying a person who turns out to be incompetent to stand trial, *Johnson v. Norton*, 249 F.3d 20, 26 (1st Cir. 2001), the parties requested and the Court ordered the defendant committed to BOP to undergo competency restoration and evaluation pursuant to 18 U.S.C. § 4241(d). (Docket Nos. 109, 111).

*The BOP Forensic Evaluation*

On July 13, 2022, after a four-month evaluation of the defendant, the BOP personnel at FMC Butner issued their most recent Forensic Evaluation ("FE"). The FE's description of the defendant's evaluation raises yet more concerns regarding his mental health. Of note:

- The defendant was, again, minimally participatory during the evaluation period. He noted in at least two instances that he preferred to stay silent or that it was his right not to speak. (FE at 6, 7).

- His appearance and grooming were not adequately maintained. (*e.g.*, FE at 7, 9).

- He repeatedly did not meet criteria for involuntary medication under *Washington v. Harper* based on dangerousness to himself or others while in confinement (FE at 7, 8, and 13).

- He engaged in some behavior suggesting of persecutory delusions ("e.g., fixed beliefs that surround the idea that one is going to be harmed, harassed, and so forth by an individual, organization, or other group"). (FE at 11).

- On April 8, 2022, following a dispute over a unit transfer, the defendant stated, "You are going to treat GOD like this? I am GOD." When asked how he knew he was God, he rubbed his shirt in the chest area and described that it was written on his shirt. His voice was loud and he was shouting. He also noted that he had been the owner of the CIA and the "top rank" of the CIA for forever. He stated his current age was 26; when confronted that the CIA was more than 26 years old, he again yelled to "stop lying to God". He also stated, "I want all my objects over here in the exact right place!" before laying down in his bed. He refused to let nursing staff cut his fingernails. He had an elevated pulse, and he did not respond when asked if he was anxious. (FE at 7).

- On May 20, 2022, the defendant was transferred to a secure mental health unit in order to trim his nails. He asserted to BOP staff that he was in the CIA and that the CIA was aware of where he was. When asked why he was sent [to FMC Butner]

7

      for competency restoration, he stated because he remained silent in front of the judge who took his mutism as evidence of incompetency. He denied that he had current charges pending; his charges were reviewed with him, but he was not amenable to feedback. When offered a shower, he noted "I am clean" and stated that he used an "electronic shower," but was not able to explain how the electronic shower worked. When provided feedback that he had a mental illness and would benefit from medication, he disagreed and said, "I am healthy, I have no mental illness". The FE assessed his thought processes as "illogical", and stated that he responded to questions "irrelevantly". (FE at 8).

- On June 2, 2022, the defendant declined psychiatric medications and reported that he did not have a mental illness. His hygiene continued to be poorly maintained. (FE at 9).

- On June 27, 2022, the defendant yelled a clinician that he did not need medication and was not mentally ill. (FE at 9).

The BOP considers a diagnosis of schizophrenia applicable to the defendant. (FE at 9-13). It opines that his mental illness significantly impairs his competency-related skills; that he does not appear to have a factual understanding of his case; and that he does not have the ability to make case-related decisions and is not able to work with his attorney. (FE at 12).

The Forensic Evaluation concludes:

> [I]t is our opinion his mental condition, namely schizophrenia, continues to render him not competent to proceed to trial. Based upon the data that most individuals with chronic psychotic disorders have some degree of improvement in the symptoms of their illness, the undersigned evaluator opines a substantial probability exists that his competency to stand trial can be restored with appropriate treatment … and that less intrusive methods of treatment, such as psychotherapy, are not likely to restore his competence. He has refused to accept recommended medication treatment on a voluntary basis. Should the Court determine that additional restoration efforts are appropriate, we would request the court order treatment with psychotropic medication on an involuntary basis.

FE at 13 and 14.

    III.    <u>Argument</u>

As an initial matter, the Supreme Court has emphasized that before conducting a *Sell* analysis, courts should consider "whether forced medication is warranted 'for a *different* purpose,

8

such as the purposes set out in *Harper* related to the individual's dangerousness, or purposes related to the individual's own interests where refusal to take drugs puts his health gravely at risk.'" *United States v. Burhoe,* 692 F.Supp.2d at 137, 142 (D. Me. 2010) (quoting *Sell*, 539 U.S. at 181–82 and referring to *Washington v. Harper,* 494 U.S. 210 (1990)). Based on the BOP Forensic Evaluation that the defendant is not now a danger to himself or to others while in confinement, the Court should find that the defendant does not meet the criteria for involuntary treatment pursuant to the *Harper* standard. The Court should therefore analyze the defendant's condition under *Sell*.

*Sell Factor 1 – Important Governmental Interests*

The government respectfully suggests that there are important governmental interests in bringing the defendant to trial. In *Sell*, the Supreme Court recognized that "[t]he Government's interest in bringing to trial an individual charged with a serious crime is important." 539 U.S. at 180. This interest is strong "whether the charge is a serious offense against a person or a serious crime against property" because "[i]n both instances the Government seeks to protect through application of criminal law the basic human need for security." *Id.*

A.   *The Defendant is Charged with a Serious Crime*

When determining whether a crime is "serious," courts look at either the maximum penalty for a charged offense, a defendant's estimated Guidelines Sentencing Range, or both. *United States v. Gutierrez*, 704 F.3d 442, 449 (5th Cir. 2013); *United States v. Palmer*, 507 F.3d 300, 303 (5th Cir. 2007).[1] Generally, "crimes authorizing punishments of over six months are 'serious.'"

---

[1] While some circuit courts account for the expected guidelines range when judging the "seriousness" of the crime, the Fifth Circuit has discouraged the use of the expected guidelines range for this purpose, in part because there is no presentence investigation report at this stage in the proceedings and, thus, any estimates of what the guidelines range may be would be speculative.

9

*Palmer*, 507 F.3d at 304.  Here, the defendant is charged with conspiracy to obtain unauthorized access to computers and to traffic in access devices (Count 1) and to launder the proceeds of specified unlawful activity (Count 2).  These charges carry maximum penalties of 5 and 20 years, respectively, and his Guidelines Sentencing Range upon conviction—in the hundreds of months—would be significant.  By any measure, these offenses are serious ones within the meaning of *Sell*, and they support a finding that important governmental interests are at stake.  *See United States v. Slavin*, 2022 WL 576016 (9th Cir. Feb. 25, 2022) (fraudulent investment scheme spanning roughly eight years and costing investors at least $1.7 million was a "serious offense that the government ordinarily would have an important interest in prosecuting); *see also United States v. Vigeant*, 2012 WL 3064410, *4 (D. Mass. Apr. 18, 2012) (citing cases considering maximum penalties in *Sell* analysis); *but see United States v. Dumeny*, 295 F. Supp. 2d 131, 132 (D. Me. 2004) (finding that government did not meet *Sell* importance criterion in a case charging only possession of a firearm).

      B.     <u>No Special Circumstances Lessen the Government's Interests</u>

After evaluating the seriousness of the crimes at issue, courts also look to whether any "[s]pecial circumstances" exist that "may lessen the importance of that interest."  G*utierrez*, 704 F.3d at 449.  Examples of special circumstances include the likelihood, given "[t]he defendant's failure to take drugs voluntarily," that he will face "lengthy confinement in an institution for the mentally ill . . . that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime" and "the possibility that the defendant has already been confined for a significant amount of time."  *Id.*  No such factors diminish the government's interests here.

---

*See Gutierrez*, 704 F.3d at 451; *United States v. Burhoe*, 578 F. Supp. 2d 195, 204 (D. Me. 2008) (Guidelines range too speculative to consider in Sell analysis).

First, if defendant were not restored to competency, he could be civilly committed (rather than released), but *only* if found by clear and convincing evidence to be "presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another[.]" 18 U.S.C. § 4246. While a civil commitment proceeding is theoretically possible, the Forensic Evaluation concludes the defendant fails to satisfy the requirements for involuntary medication under *Washington v. Harper*. He has not behaved violently or dangerously to himself or others in prison. It would thus be speculative to assume that he will end up being civilly committed. *See Gutierrez*, 704 F.3d at 450 (government's prosecutorial interests are not weakened where "the likelihood of civil commitment is uncertain"). There is accordingly no likely civil commitment that undermines the government's interests here. *See Vigeant*, 2012 WL 3064410 at *4.

Nor is the government's interest in prosecuting the defendant diminished by the fact that he has been detained pre-trial. The defendant faces up to 25 years in prison for his charged offenses, and he has been in custody for only three and one-half years. Even if it were determined that he has already served his likely sentence, such a circumstance does not defeat the government's interest in prosecuting him. *See Palmer*, 507 F.3d at 304-05 ("[D]espite the fact that Palmer may serve very little, and possibly no, prison time even if he is tried, the governmental interest, as the court explained in *Sell*, is not in seeing him convicted, but rather ensuring that he is brought to trial."); *see also United States v. Nicklas*, 623 F.3d 1175, 1179 (8th Cir. 2010) (government's interest in prosecuting defendant for transmitting threats through interstate commerce was not undermined by the fact that he had served almost half of the statutory maximum penalty).

The government's interest here goes beyond the number of months a defendant spends in prison, and includes protecting the public, bringing justice to the victims, "express[ing] society's disapproval" of the criminal conduct, and "potentially deter[ring] others from engaging in it." *Gutierrez*, 704 F.3d at 451; *see also United States v. Pfeifer*, 661 F. App'x 618, 620 (11th Cir. 2016) (district court did not clearly err when it concluded that the government had a sufficient interest because the defendant's conduct of threatening governmental entities and assaulting family members "upset the basic need for security of those he threatened").

One other way that prosecution helps to fulfill society's goals is by "authoriz[ing] the district court to impose a term of supervised release," which would facilitate monitoring the defendant to ensure that he does not pose a threat to others. *See Gutierrez*, 704 F.3d at 451; *United States v. Onuoha*, 686 F. App'x 401, 403 (9th Cir. 2017) (link between the defendant's mental disorder and charged crime made his prosecution "all the more important" because "absent prosecution and treatment, there is a risk Onuoha may repeat similar threats in the future").

In sum, there is nothing unique about the defendant's case that diminishes the governmental interest in prosecuting him.

IV.     Conclusion

Under these circumstances, the government respectfully requests that the Court find that the first *Sell* factor is satisfied, and that it order the BOP to submit an addendum to its Forensic Evaluation that outlines, in detail, the proposed treatment plan and other details pertinent to the remaining *Sell* factors. *See Filho*, 245 F. Supp.3d at 312 (denying a *Sell* motion in the absence of a proposed treatment plan and how the plan related to the defendant's specific condition); *Vigeant*, 2012 WL 3064410 at *7 (describing in detail the types of medications used and how they would be administered). The Court should also order excluded under the Speedy Trial Act the time necessary for the BOP to submit the addendum. *See generally* 18 U.S.C. § 3161(h)(4) (relating to any period of delay resulting from the fact that the defendant is mentally incompetent or physically unable to stand trial). On November 1, 2022, counsel for the defendant assented to the government's filing of this motion and indicated that he may wish to have the defendant's retained expert address the second through fourth *Sell* factors once the BOP has offered its treatment plan.

Respectfully submitted,

RACHAEL S. ROLLINS
UNITED STATES ATTORNEY

*s/ Seth B. Kosto*
SETH B. KOSTO
Assistant United States Attorney
One Courthouse Way
Boston, Massachusetts 02210

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2022, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all defense counsel of record.

*s/ Seth B. Kosto*
SETH B. KOSTO
Assistant United States Attorney
(617) 748-3100